GILHOOLEY *vs.* WASHINGTON. [217]

Where a tenant by lease *under seal*, abandons the demised premises, and resists the payment of rent subsequently accruing on the ground that other apartments in the same building adjoining or below his, are occupied as a place of riot and prostitution, he must show that his landlord created the nuisance by leasing such apartments for that purpose, or that it existed by his connivance and consent.

In an action upon a lease *under seal* to recover a quarter's rent payable in advance, and becoming due after the tenant had abandoned the premises, it appeared that before the execution of the lease, the landlord had let the lower apartments of the building to another person whose name was not shown. These apartments were occupied as a place of prostitution, drinking, &c., whereby great noise and disturbance were made, but it was not shown that the landlord had leased them for any such purpose, or that they were so occupied with his connivance or consent, nor was there affirmative evidence to show that the person so occupying held under the landlord. The defendant after quitting the premises, and before the quarter's rent in question fell due, gave notice to the landlord of the existence of the nuisance, but the landlord took no steps in the matter. The court below having given judgment in favor of the landlord for the rent demanded, the same was affirmed in this court.

In the equitable action for use and occupation, the tenant is not answerable unless he has had the beneficial enjoyment of the property.

But the action of covenant upon a sealed lease for the non-payment of rent, does not depend upon the occupation or enjoyment of the premises demised.

THE complaint in this case was upon a lease under seal, whereby the defendant rented of the plaintiff the dwelling part of a house in New-York, over the store and entry, with a privilege in the yard, for the term of four years, from May, 1, 1848, at the yearly rent of $550 payable quarterly in advance, and the plaintiff claimed to recover rent for the quarter commencing on the 1st day of May, A. D. 1849. The lease contained the usual covenant for quiet enjoyment. It was proved on the hearing of the case before a referee, that the defendant by his undertenants, occupied the premises under the lease until February, 1849, when he abandoned the same on the ground that the lower part of the house was occupied as a place of prostitution and ill fame. The referee in his report stated that during all the period of the defendant's occupancy and subsequent- [218]

Gilhooley *v.* Washington.

ly, the lower room of the house was used by the keeper thereof as a place of prostitution, and as a bar or drinking room, and was divided into small apartments into which lewd women, who frequented the drinking room, were in the habit of retiring with men for the purposes of prostitution, and that great noise and disturbance were of frequent occurrence; and that on the 19th of March, 1849, the defendant notified the plaintiff in writing, that the place was so kept for the purpose of prostitution, &c. The referee further reported that before the said lease was given to the defendant, the plaintiff had let the said lower part of the building to some person other than the defendant, whose name was not disclosed. The report then proceeded to state that the referee had not ascertained from the pleadings or evidence that any part of the building was used by the plaintiff or with his consent or connivance, for the purposes of prostitution and ill fame, or by any person deriving through, from, or under him, or that the said noise and disturbance were made by the plaintiff or with his connivance or consent, or by any one occupying under him. The referee therefore reported in the plaintiff's favor for the sum claimed, and the superior court of the city of New-York, in which the suit was brought, affirmed his decision. The defendant appealed to this court.

*J. Coit*, for appellant.

*F. Byrne*, for respondent.

BRONSON, Ch. J. If it be not unlawful to speak of things by their old names, this is an action of covenant on a lease for the non-payment of a quarter's rent; and the defendant has pleaded an eviction by the landlord. The proof to support the plea is, that the defendant after occupying the demised premises for about nine months, abandoned the same before the commencement of the quarter in question, on the ground that the basement part of the building, during all the time he was in possession, had been used as a place of prostitution and ill fame. [219] The plaintiff had leased the basement to some person whose

Gilhooley *v.* Washington.

name does not appear; but it was not shown that the plaintiff had any connection whatever with the nuisance which induced the defendant to quit the premises; nor does it appear that the plaintiff knew of the nuisance until the defendant gave him notice of the fact, which was about a month after he had abandoned the possession. On this case the superior court of the city of New-York gave judgment for the plaintiff, and I do not see how they could have done otherwise. It is possible that the referee might have reported the facts more favorably for the defendant than he has done. But we must take the facts as they are stated, and only such as are stated in the case; and they are so far from making out an eviction by the landlord, that they do not even show any moral delinquency on his part. In *Dyett* v. *Pendleton*, (8 *Cowen*, 727, *and* 4 *id.* 581,) which has been regarded as an extreme case, (*see* 5 *Hill*, 54,) the landlord himself drove the tenant out of his part of the house, by bringing a moral pestilence into another part of the building. Nothing of that kind appears in this case. It is not found that the plaintiff either created or connived at the nuisance of which the defendant complains; nor is it found that the mischief was done by any person deriving title through, from, or under the plaintiff. For aught that appears the nuisance may have been created by one who entered in hostility to the plaintiff and his title. There is no principle upon which the plaintiff can be made answerable for the wrong.

In the equitable action for use and occupation the English courts hold, that the tenant is not answerable unless he has had the beneficial enjoyment of the property, and they have gone a great way in protecting the tenant against disturbances of all, kinds. (*Edwards* v. *Hetherington*, 7 *Dowl. and Ry.* 117 ; *Salisbury* v. *Marshall*, 4 *Car. & Pay.* 65 ; *Cowie* v. *Goodwin*, 9 *id.* 378 ; *Smith* v. *Marrable*, 1 *Car. Marsh*, 479; *Collins* v. *Barrow*, 1 *Moody & Rob.* 112.) But the principle of these cases has never been applied to the action of covenant for the non-payment of rent, which does not depend on the fact of occupation or enjoyment.

I think the judgment is right, and should be affirmed.

[220] TAYLOR, J. (dissenting.) The lessor cannot be rendered liable for the acts of a mere wrongdoer, by such a covenant for quiet and peaceable enjoyment, as is contained in the lease from Gilhooley to Washington. That covenant only secures the tenant against lawful interruption in such enjoyment, or an interruption by the lessor or those claiming under him, and not by a stranger. (*Arch. L. & T.* 278.) Under such a covenant subject to these limitations, " peaceable and quiet possession" of the premises is in its nature, a condition precedent to the payment of rent; for as Gilbert on Rent says, p. 145 : " If the tenant be deprived of the thing letten, the obligation to pay rent ceases ; because such obligation has its force only from the consideration, which was the enjoyment of the thing demised." (8 *Cowen,* 730.) The cases in our courts which have sustained the principle, that a nuisance like this releases the tenant from his obligation to pay rent, have either shown the lessor to be directly the author of the nuisance, or that he has let the premises for the purpose which made them a nuisance.

In the case before us, he neither kept the bawdy house himself, nor was it proved that he demised the apartments for the specific purpose of being so used. The store, as it was called in Washington's lease, which was the place of prostitution, was situated directly under the premises demised to Washington, and was a part of the same tenement. It was proved before the referee, that this store or basement story, had been let *by the plaintiff* to some person previous to the demise to Washington. Here the testimony ended. The ownership then, and control of the basement story, having been proved to be in the lessor, if any change had subsequently taken place, by sale or otherwise, which deprived him of the ownership or control, such fact was known to him, and it was clearly his privilege to have shown it. But as he did not, I know not how we can presume that any such change had been made, previous to the notice served upon him by Washington. The facts then appear uncontradicted that Gilhooley had leased the basement story to some person unknown to Washington ; and that under that demise it had been and still was used as a resort for lewd

Gilhooley *v.* Washington.

men and women, a house of prostitution, and in other [221] respects had become a nuisance; and of the existence of this nuisance the lessor, more than 40 days before the commencement of the rent for which this suit was brought, had a regular notice served upon him by the lessee, calling for its abatement.

The law (2 *R. S.* 702, § 29) renders the lease of a house void after the tenant has been convicted of a misdemeanor in keeping the same as a bawdy-house, and the landlord may re-enter notwithstanding the lease. But of this right to oust the tenant no one can take advantage but the landlord himself. The conclusion then is unavoidable that the lessee of the basement being the tenant of Gilhooley, who alone had power to oust him, continued to occupy the premises as a bawdy-house by the permission of his landlord.

The doctrine established in England by numerous cases decided recently in the courts of that country, undoubtedly is, that there is an implied warranty in the lease, that the demised premises are habitable and free from serious nuisance. Where a tenant held a shop and house as tenant for years, and the lessor, shortly before midsummer day, put in workmen with the *tenant's consent*, to repair the party wall, the inconvenience was so great that all the tenant's lodgers left him, and the tenant was obliged to procure lodgings elsewhere for himself and his family, he paid the rent up to midsummer and continued to occupy the shop until the 5th of July following, when he quitted without notice. The court held that as he had no beneficial occupation after midsummer, an action for use and occupation could not be maintained against him for rent subsequently accruing. (*Edwards* v. *Hetherington*, 7 *Dowl. & Ry.* 117.) In *Cowrie* v. *Goodman*, (9 *Car. & P.* 378,) in an action for use and occupation, the tenant proved that the wall of the privy gave way, and the filth from it flowed into the kitchens so as to render them uninhabitable. Lord Denman said: I shall ask the jury whether these premises were unfit for proper and comfortable occupation, and if the defendant had *bona fide* quitted the apartments as soon as he could procure others, and the jury having answered both questions in the affirmative, the plaintiff [222]

was nonsuited, and on motion for a new trial for misdirection the rule was refused. So where the defendant rented premises under a written agreement for three years, but quitted them at the end of six months, the house for want of sufficient drainage, proving unwholesome, noisome, offensive and unfit for habitation, the plaintiff promised to build a sewer to remedy the defect, but never did so; in an action brought by him for use and occupation to recover rent accruing subsequently to the tenant's quitting; Bailey, J. held that if the defendant made out to the satisfaction of the jury, that the premises were noxious and unwholesome to reside in, and that this state arose from no default or neglect of the tenant, but from some cause over which he had no control, or none except at an extravagant or unwarrantable expense, he was not bound to remain. He was not bound to make a sewer, and if nothing else could keep the house wholesome he was justified in quitting it. (*Collins* v. *Barrow*, 1 *Mood. & Rob.* 112.)

If the landlord by any misconduct on his part, render the occupation of the tenant so uncomfortable that he is obliged to quit the premises and seek a residence elsewhere, he can not afterwards recover in an action for use and occupation of the premises after the defendant had quit them. (*Per Coleridge, J. in Kirkham* v. *Jervis*, 7 *Dowl.* 678.) The same doctrine is maintained in the later case of *Smith* v. *Marable*, (11 *Mees. & W.* 5,) where the tenant, upon entering into a furnished house, found it so infested with bugs, that it was impossible to dwell in it, and left it, it was holden that he was liable to pay rent only for the time he occupied it. In the case of *Collins* v. *Barrow* before cited, Bailey, J. said, I do not see that the fact of the tenancy in this case being under a written agreement is material. In any case, the tenant is bound to pay rent unless he satisfies the jury that under the circumstances he was justified in quitting. Although the authority of *Smith* v. *Marable* has, to some extent, been questioned by the same court in the case of *Hart* v. *Windsor*, (12 *Mees. & W.* 68,) yet the main doctrine affirmed in that case, has been too long, too often and too ably [223] sustained by the English courts to be shaken; and in my

view, the doctrine accords as well with the claims of justice as it does with the adjudication of those courts.

It was formerly thought that an actual expulsion with force and arms was necessary to create a legal eviction. But that doctrine has been exploded for a long time, and it is now justly held, that many things amount to an eviction of the tenant which involve no actual force. The causes which in the English cases cited were adjudged adequate to defeat the claim for rent, were all of a physical character; those existing in the case before us are of a physical and moral character combined; but altogether creating on the part of the tenant, an inability for the peaceable and quiet enjoyment of the premises, incomparably more intense than those merely physical causes, which there were held sufficient to discharge the tenant's liability. The principle clearly established by those decisions applies to this; and there undoubtedly, this defence would be deemed conclusive.

The leading case in our courts, is that of *Dyett* v. *Pendleton*, (4 *Cowen*, 581,) *and S. C. in C. of E.* 8 *id.* 727.) The main and only difference between that case and this is, that there the landlord himself habitually brought lewd women into apartments adjoining those demised, and to recover rent for which the suit was brought; while in this, the same annoyance and offence against decency and good morals, was created by another tenant of the same landlord. In the supreme court in that case, two points were decided. 1. That there could be no eviction without an actual entry and expulsion of the lessee; and 2d. That a landlord is guilty of such a nuisance is not sufficient to bar his claim for rent. Sutherland, J. in giving the opinion of the court said, the acts were most exceptionable in themselves; and if they could not be abated, the defendant had not only a moral right, but it was his moral duty to abandon the scene of riot and prostitution. While the doctrine affirmed by him is, that there cannot be an eviction without an actual entry, thus leaving the conclusion inevitable that while it was his moral right and duty to abandon the premises under certain circumstances; yet as this could not constitute an eviction [224] he must still continue to pay the rent. Both points were over-

ruled by the court of errors, by a decisive vote; and it would be an act of supererogation for me to argue the points after the full discussion given them by the distinguished Senators Spencer and Crary; one of whom took the ground since established as law in the English courts, that peaceable and quiet possession is a condition precedent to the payment of rent. And he sustains the position by a vigorous argument drawn from Baron Gilbert's Treatise on Rent, page 185.

In *Ogilvie* v. *Hull,* (5 *Hill,* 54,) Nelson, C. J. after stating the well settled general principle that an entry and expulsion of the tenant by the landlord, or some deliberate disturbance of the possession, depriving the tenant of the beneficial enjoyment of the demised premises, 'is necessary to operate a suspension of rent, proceeds to comment upon the case of *Dyett* v. *Pendleton.* But he does not in any way impugn the doctrine of that case. He says it shows only an application of the doctrine to an extreme case. There the grossly lewd and immoral conduct of the landlord in the adjoining premises, (another part of the same dwelling,) was so offensive to common decency, and accompanied with such riotous and outrageous disturbances as effectually to destroy the quiet occupation and beneficial enjoyment of the demised tenement, and render it uninhabitable by respectable people. This was considered such a disturbance and destruction of the reasonable use and occupation of the premises as amounted to a virtual expulsion of the tenant: Thus affirming the great and leading principle involved in the other case.

*The People* v. *Erwin,* (4 *Denio,* 130,) was an indictment of the owner of a house rented to be kept as a bawdy house; and *Fish* v. *Dodge,* (4 *Denio,* 311,) was an action on the case for conducting a lawful business in such a manner as to cause a nuisance to the neighborhood. I do not see that either of them conflict with the defence set up in the case at bar.

Judge Sutherland, in giving the opinion of the court in *Dyett* v. *Pendleton* in the supreme court, held the law to be that if the offensive and immoral acts complained of could not be abated, (that is by the tenant,) the defendant had not only a moral

right, but it was his moral duty to abandon the scene of [225] riot and prostitution. But he erred in assuming that the tenant could abate the nuisance. The police of the city, he says, upon complaint of the defendant, would instantly have taken the plaintiff and his associates into custody, and punished them by fine and imprisonment, as often as the offence was repeated. This was true: but it would not have abated the nuisance. None but the landlord himself could re-enter and oust the corrupt occupants from the enjoyment of their domicil; and it would be an unreasonable requirement of the tenant to spend his time and money in prosecuting other tenants of his landlord during his whole term, continuing to endure the foul contagion of such a polluted neighborhood, while the landlord could by a single act relieve him from further anoyance, which he refused to do.

By thus refusing to interfere for the relief of the tenant, where he and he alone held a power adequate to the occasion, he constituted himself a *particeps criminis* and ought to be accountable for the acts of his tenant. The judgment should be reversed.

Judgment affirmed.