E. P. GRAY, Respondent, *v.* JAMES W. GAFF ET AL.,
Appellants.

8  329
44  281

### February 10, 1880.

1. The renting of premises to a tenant who carries on a business therein which renders inconvenient the occupation of adjoining premises rented by the same landlord, does not amount to an eviction of a tenant of the latter premises, and, in the absence of provisions to that effect in the lease, does not relieve the tenant suffering the nuisance from paying rent under his lease.

2. Oral promises made by the landlord, contemporaneous with the execution of the lease, that the adjoining premises should not be used in a manner inconsistent with the convenient occupation of the leased premises, is incompetent.

APPEAL from the St. Louis Circuit Court.

*Affirmed.*

NOBLE & ORRICK, for the appellants : An eviction in fact, or in effect, which renders the premises useless, will prevent a recovery of rent. — *Halligan* v. *Wade*, 21 Ill. 470 ; *Dyett* v. *Pendleton*, 8 Cow. 734 ; *Cohen* v. *Dupont*, 1 Sandf. 260 ; *Roswell* v. *Prior*, 12 Mo. 635 ; *Thompson* v. *Gibson*, 7 Mee. & W. 456 ; *Fish* v. *Dodge*, 4 Denio, 316. The acts of the respondent amounted to an eviction.— *Jackson* v. *Eddy*, 12 Mo. 209, and cases cited *supra*.

T. W. B. CREWS, for the respondent : There was no contract as to the occupation of the adjoining premises, and the doctrine of *caveat emptor* applies. — *Street* v. *Selden*, 7 Wall. 416 ; *McGlashen* v. *Talmadge*, 37 Barb. 313. Oral testimony tending to vary the written contract was inadmissible.— *Helmrichs* v. *Gehre*, 56 Mo. 79.

BAKEWELL, J., delivered the opinion of the court.

The statement of counsel for appellants, with the correction of a slight inaccuracy, is substantially adopted, and is as follows : —

"Appellant leased of respondent the back part of two warehouses in St. Louis, known as Nos. 1005 and 1007

Broadway. The demised premises fronted on an alley. The rent was payable monthly. Appellants leased the premises to be used as a stable for horses, and respondent had notice of this at the time the lease was made. After the execution, but before the delivery of the lease, appellants suggested that it ought to contain a provision that the stores in front on Broadway, which were separated from the premises of appellant by a mere wooden partition, should not be rented or used for any purposes that would interfere with appellants' business. To this respondent replied, that it was useless to rewrite the lease; that he was desirous to retain appellants as his tenants, and that they might rely upon it that the front premises should not be so used as to annoy appellants.

" The respondent was the owner, and so continued to be the owner, of two small stores covering the front part of the premises of which the stables rented to appellants were a part; and, at the date of the lease, these two small stores in front were occupied, one by a commission-merchant and the other by a barber.

"Appellants took possession of the premises under the lease, and occupied them until the latter part of July, 1878, having paid to respondent the monthly rental of thirty dollars, as fixed by the lease, for the whole time they actually occupied the premises.

" In May, 1878, the commission-merchant who occupied one of the front stores vacated the same, and appellants, hearing that respondent was about to rent it as a restaurant, notified respondent at once not to do so, for the reason that a restaurant would prevent appellants from using the premises they had rented, as a stable, as the heat, smoke, and fumes from the restaurant would endanger the lives of their horses. Respondent, notwithstanding his assurances to appellants when they accepted the lease, that he would not permit the front part to be occupied in such a way as to inter-

fere with appellants' enjoyment of the premises, paid no attention to this notice and warning, but in May, 1878, leased the store which had formerly been occupied by the commission-merchant, as a restaurant, and that store was used as a restaurant from May, 1878, continuously up to August 1, 1878, and after.

" On June 25, 1878, appellants notified respondent, in writing, that unless something was done to relieve them from the effects of the restaurant they would be compelled to leave the premises, as the smoke, heat, and fumes from the restaurant were destroying their horses. Respondent paid no heed to this notice. Then, again, on July 25, 1878, appellants notified the respondent, in writing, that they would give up the stable August 1, 1878, as their horses were suffering from the heat, smoke, and fumes from the restaurant, and their lives were in danger. Respondent paid no attention to the notice. Appellants paid the rent due up to August 1, 1878, and then vacated the premises and tendered the key to respondent, which he refused to take, claiming that appellants had rented the premises for one year, and insisted they should pay for the whole year. Respondent in this action sued before a justice of the peace for the rent from August 1 to September 1, 1878; there was judgment in the courts below for respondent, and appellants now bring the case to this court by appeal.

" It was proved on the trial that the room occupied as a restaurant was only rented by the respondent from month to month; that the restaurant room was a part of the same building with the stable, and that both were under the control of respondent; that the partition between the restaurant and stable was made of pine boards, upright, and not tongued or grooved, having cracks between each and all of them, and that in one part of the partition there was an open space the size of a door.

" That by reason of a defect in the flue leading from the

restaurant, smoke came, first into the restaurant, and through the partition into the stable.

"That the cooking-stove in the restaurant was located near the partition, and was in constant use during the day and part of the night, from May, 1878, to August 1, 1878; that four of the stalls for appellants' horses fronted up against the partition, and the others — some ten — fronted along the brick wall of the stable.

"That a veterinary surgeon was called to attend the horses when thus affected, and he advised that, if not removed, they would die from the effects of the heat and smoke. Appellants, after having given the warnings and notices to respondent as above stated, vacated the premises the latter part of July, 1878, because they were unable to occupy them for the purpose for which they rented them, to wit, as a stable.

"The respondent offered no evidence other than his lease, and upon this testimony the court below instructed the jury that, under the evidence, they should find for respondent; to the giving of which instruction the appellants duly excepted, and in due time filed their motion for a new trial, which was overruled by the court.

"Appellants insist that, upon the case made, appellants in effect were evicted from the premises by the respondent, and therefore there can be no recovery for rent, except for the time during which appellants actually occupied the premises; and as appellants paid the rent during the whole time they occupied, the court below erred in its instructions to the jury."

If the lessee chose to rely upon verbal assurances, that was his own imprudence. This action is upon the written lease. Unless the acts set forth above amount to an ouster by the landlord, there can be no doubt that the judgment on these facts was for the right party, and should not be disturbed. If there has been an ouster of any material part of the premises, the tenant may treat this as an eviction and

throw up the lease ; and if he does so, he is no longer liable for rent. Taylor's L. & T., sect. 315.

But no mere acts of molestation, even though committed by the landlord himself, or by a servant at his command, will occasion a breach of the covenant of quiet enjoyment, which covenant goes to possession, unless they are more than a mere trespass. Id., sect. 309.

There is one case in New York which goes very far, and which is frequently referred to in the books — *Dyett* v. *Pendleton*, 8 Cow. 727. It was held there that a tenant may be deprived of the enjoyment of the premises by the gross moral turpitude of the landlord, and that such conduct may amount to an eviction. There the landlord habitually brought abandoned women under the same roof with the demised tenement, who by their cries, drunken orgies, and obscenities, rendered the whole building unfit for the purposes for which it was rented. This has been considered an extreme case, and has been modified by subsequent decisions in the same State. The decision itself reversed the unanimous decision of the Supreme Court. 4 Cow. 581. It is noticed by Judge Cowen, in *Etheridge* v. *Osborn*, 12 Wend. 532, as carrying the doctrine of eviction to its utmost verge. In *Ogilvie* v. *Hull*, 5 Hill, 54, Chief Justice Nelson calls the case of *Dyett* v. *Pendleton* an extreme one ; but says that it does not introduce a new principle, and seems to consider that the outrageous conduct of the landlord must be taken to amount to a virtual declaration on his part that he would not have his more respectable tenants under the same roof with him. An act done by the landlord on the premises, with the intent of depriving the tenant of the enjoyment or occupation of the demised premises, if acceded to by the tenant by yielding possession in a reasonable time, though not a physical ouster, will suspend the payment of rent. *Royce* v. *Guggenheim*, 106 Mass. 201 ; *De Witt* v. *Pierson*, 112 Mass. 10. On this theory, perhaps, the New York case might be reconciled

with the established rule. But in Massachusetts it is considered that *Dyett* v. *Pendleton* is not authority, and that it has been overruled by the later New York cases.

*Jackson* v. *Eddy*, 12 Mo. 209, was decided in Missouri whilst the case in 8 Cowen was newly decided, and seems to be based upon the authority of that case. Whether it would now be followed by the Supreme Court of this State may be doubted. But it goes no further than this, whether we consider the point decided, or what is said in the case : that if the lessor himself, directly, by any wrongful act, disturbs the possession which he should protect and defend, he thereby forfeits his right, and the lessee may abandon the possession, and thereby exonerate himself of the liability to pay rent. This must be on the ground that it is to be taken as a declaration on the part of the landlord that he intends that the tenant shall no longer retain possession. The Missouri case goes even further than the New York case, as the facts are not so strong against the landlord, there being no moral turpitude. But in both these cases the acts which were followed by the abandonment of the premises, and held equivalent to an eviction, were the acts of the landlord himself, and not of a tenant.

In the case at bar, the landlord rented adjoining premises to a tenant who erected upon the premises demised to him what is claimed to have been — and what seems to have been, under the circumstances — a private nuisance ; since anything constructed on a person's premises which by itself, or by its intended use, directly injures a neighbor in the proper use and enjoyment of his property, is a nuisance. 46 Ala. 382. But, to render the landlord responsible for a nuisance created on premises demised by him, the nuisance must be one that necessarily arises from the tenant's ordinary use of the premises for the purposes for which they were let, and not to be avoided by reasonable care on the tenant's part. Wood. on Nuis., sect. 175. If it is pro-

duced only by the act of the tenant, the landlord is not responsible.

We, however, are satisfied that the established law of the present case is, that the mere fact that the landlord rents premises to a tenant who carries on a business there incompatible with the convenient occupation of adjoining premises, also rented by the same landlord, does not amount to an eviction, and, in the absence of a provision to that effect in the lease, does not relieve the tenant who suffers from the nuisance from the obligation of paying rent under his lease.

In an action for use and occupation, the English courts go far in protecting the tenant from annoyances of all sorts, and hold that if the landlord, by his misconduct, render the occupation of the tenant so uncomfortable that he is virtually driven out, the landlord cannot recover for use and occupation after the tenant has quit. *Kirkman* v. *Jervis*, 7 Dowl. P. C. 678. But, as Judge Bronson remarks in *Gilhooley* v. *Washington*, 4 N. Y. 217, an action for the non-payment of rent does not depend on the act of occupation or enjoyment, as the equitable action does; and the principle of these cases does not apply.

There is no implied covenant or warranty on the part of a lessor that the premises are tenantable. *Cleves* v. *Willoughby*, 7 Hill, 83.

It was incompetent in the present case to show by oral testimony, as was attempted, any contemporaneous promise on the part of the landlord that the adjoining premises should not be used in a manner inconsistent with the livery-stable business, or so as to annoy the defendants. The judgment must be affirmed. Judge LEWIS is absent; Judge HAYDEN concurs.