Chenango Bridge Company agt. The Binghamton Bridge Company.

C. M. Burrill, *for defendant, appellant.*
D. D. Lord, *for plaintiff, respondent.*

———◆◆———

# UNITED STATES SUPREME COURT.

The Chenango Bridge Company, plaintiffs in error agt. The Binghamton Bridge Company, defendants in error.

The constitutional right of one *legislature* to grant corporate privileges and franchises, so as to bind and conclude a succeeding one, is settled and undeniable. An act of incorporation by the legislature is a *contract between the state and the stockholders,* and all courts at this day, are *estopped* from questioning the doctrine.

Chenango Bridge Company agt. The Binghamton Bridge Company.

If there is no ambiguity in the charter of a corporation, and the powers conferred are plainly marked, and their limits can be readily ascertained, then it is the duty of the court to uphold and sustain it, and to carry out the true meaning and intention of the parties to it.

The *legislature* of the state of New York, in 1808, by the charter granted to the *Chenango Bridge Company, contracted* with this company, to the effect that if they would build and maintain a safe and suitable bridge over the Chenango river at Chenango Point, for the accommodation of the public, they should have in consideration for it a *perpetual charter*, the right to take certain specified tolls, and that it should not be lawful for any person or persons *to erect any bridge,* or establish any ferry, *within a distance of two miles* on the Chenango river, either above or below their bridge:

*Held,* that the legislature by a charter granted to the Binghamton Bridge Company in 1855, authorising that company to construct a bridge for general road travel, like the Chenango bridge, and near to it, and within the prohibited distance, plainly violated the contract which they made with the Chenango Bridge Company, and as such contract is within the protection of the constitution of the United States, it follows that the charter of the Binghamton Bridge Company *is null and void.* (*Reversing the decision of the court of appeals reported* 26 *How. Pr. R.* 124 *and* 297, *and in* 27 *N. Y. R.* 87.)

*Argued at Washington, December,* 1865. *Decided February,* 1866.

IN ERROR to the supreme court of the United States, from the decision of the court of appeals, reported in 26 *Howard's Practice Reports,* 124 and 297, *and in* 27 *N. Y. R.* 87.

HENRY R. MYGATT, *for plaintiffs in error.*
DANIEL S. DICKINSON, *for defendants in error*

Mr. Justice DAVIS delivered the opinion of the court. The constitution of the United States declares that no state shall pass any law impairing the obligation of contracts, and the 25th section of the judiciary act provides, that the final judgment or decree of the highest court of a state, in which a decision in a suit can be had, may be examined and reviewed in this court, if there was drawn in question in the suit the validity of a statute of the state, on the ground of its being repugnant to the constitution of the United States, and the decision was in favor of its vaildity.

The plaintiffs in error brought a suit in equity in the supreme court of New York, alleging that they were cre-ated a corporation by the legislature of that state on the

first of April, 1808, to erect and maintain a bridge across the Chenango river at Binghamton, with perpetual succession, the right to take tolls, and a covenant that no other bridge should be built within a distance of two miles either way from their bridge; which was a grant in the nature of a contract, that cannot be impaired.   The complaint of the bill. is, that notwithstanding the Chenango Bridge Company have faithfully kept their contract with the state, and maintained for a period of nearly fifty years a safe and suitable bridge for the accommodation of the public, the legislature of New York, on the fifth of April, 1855, in plain violation of the contract of the state with them, authorised the defendants to build a bridge across the Chenango river within the prescribed limits, and that the bridge is built and opened for travel.

The bill seeks to obtain a perpetual injunction against the Binghamton Bridge Company, from using or allowing to be used the bridge thus built, on the sole ground that the statute of the state which authorises it, is repugnant to that provision of the constitution of the United States which says, that no state shall pass any law impairing the obligation of contracts.   Such proceedings were had in the inferior courts of New York, that the case was finally reached and was heard in the court of appeals, which is the highest court of law or equity of the state in which a decision of the suit could be had.   And that court held that the act by virtue of which the Binghamton bridge was built was a valid act, and rendered a final decree dismissing the bill.   Everything, therefore, concurs to bring into exercise the appellate power of this court over cases decided in a state court, and to support the writ of error, which seeks to re-examine and correct the final judgment of the court of appeals in New York.   The questions presented by this record are of importance, and have received deliberate consideration.

It is said that the revising power of this court over state

Chenango Bridge Company agt. The Binghamton Bridge Company.

adjudications, is viewed with jealousy. If so, we say in the words of Chief Justice MARSHALL, "that the course of the judicial department is marked out by law. As this court has never grasped at ungranted jurisdiction, so it never will, we trust, shrink from that which is conferred upon it." The constitutional right of one legislature to grant corporate privileges and franchises, so as to bind and conclude a succeeding one has been denied. We have supposed if anything was settled by an unbroken course of decisions in the federal and state courts, it was that an act of incorporation was a contract between the state and the stockholders. All courts at this day are estopped from questioning the doctrine. The security of property rests upon it, and every successful enterprise is undertaken in the unshaken belief that it will never be forsaken.

A departure from it *now*, would involve dangers to society that cannot be foreseen, would shock the sense of justice of the country, unhinge its business interests, and weaken, if not destroy, that respect which has always been felt for the judicial department of the government. An attempt even to reaffirm it, could only tend to lessen its force and obligation. It received its ablest exposition in the case of *Dartmouth College* agt. *Woodward* (4 *Wheaton*), which case has ever since been considered a landmark by the profession, and no court has since disregarded the doctrine that the charters of private corporations are contracts, protected from invasion by the constitution of the United States. And it has since so often received the solemn sanction of this court, that it would unnecessarily lengthen this opinion to refer to the cases, or even enumerate them.

The principle is supported by reason as well as authority. It was well remarked by the chief justice in the *Dartmouth College Case*, that "the objects for which a corporation is created are universally such as the government wishes to promote. They are deemed beneficial to the country, and this benefit constitutes the consideration, and in most cases

Chenango Bridge Company agt. The Binghamton Bridge Company.

the sole consideration for the grant." The purposes to be attained are generally beyond the ability of individual enterprise, and can only be accomplished through the aid of associated wealth. *This* will not be risked unless privileges are given and securities furnished in an act of incorporation. The wants of the public are often so imperative, that a duty is imposed on government to provide for them, and·as experience has proved that a state should not directly attempt to do this, it is necessary to confer on others the faculty of doing what the sovereign power is unwilling to undertake. The legislature, therefore, says to public spirited citizens : if you will embark with your time, money and skill, in an enterprise which will accommodate the public necessities, we will grant to you for a limited period, or in perpetuity, privileges that will justify the expenditure of your money, and the employment of your time and skill. Such a grant is a contract, with mutual considerations, and justice and good policy alike require that the protection of the law should be assured to it. It is argued as a reason why courts should not be rigid in enforcing the contracts made by states, that legislative bodies are often overreached by designing men, and dispose of franchises with great recklessness.

If the knowledge that a contract made by a state with individuals, is equally protected from invasion as a contract made between natural persons, does not awake watchfulness and care on the part of law makers, it is difficult to perceive what would. The corrective to improvident legislation is not in the courts, but is to be found elsewhere.

A great deal of the argument at the bar was devoted to the consideration of the proper rule of construction to be adopted by the interpretation of legislative contracts. In this there is no difficulty. All contracts are to be construed to accomplish the intention of the parties ; and in determining their different provisions, a liberal and fair construction will be given to the words, either singly or in

Chenango Bridge Company agt. The Binghamton Bridge Company.

connection with the subject matter. It is not the duty of a court by legal subtlety to overthrow a contract, but rather to uphold it and give it effect; and no strained or artificial rule of construction is to be applied to any part of it. If there is no ambiguity, and the meaning of the parties can be clearly ascertained, effect is to be given to the instrument used, whether it is a legislative grant or not. In the case of the *Charles River Bridge* (11 *Peters*), the rules of construction known to the English common law were adopted and applied in the interpretation of legislative grants, and the principle was recognized that charters are to be construed most favorably to the state, and that in grants by the public nothing passes by implication. This court has repeatedly since reasserted the same doctrine, and the decisions in the several states are nearly all the same way. The principle is this: that all rights which are asserted against the state must be clearly defined, and not raised by inference or presumption, and if the charter is silent about a power, it does not exist. If, on a fair reading of the instrument, reasonable doubts arise as to the proper interpretation to be given to it, those doubts are to be solved in favor of the state; and where it is susceptible of two meanings, the one restricting and the other extending the powers of the corporation, that construction is to be adopted which works the least harm to the state. But if there is no ambiguity in the charter, and the powers conferred are plainly marked, and their limits can be readily ascertained, then it is the duty of the court to sustain and uphold it, and to carry out the true meaning and intention of the parties to it. Any other rule of construction would defeat all legislative grants, and overthrow all other contracts. What, then, are the rights of the parties to this controversy?

In 1805, the state of New York passed an act in forty-two sections, creating five different corporations. The main purpose of the act was, at that early day, to secure

for the convenience of the public, good turnpike roads; but the country was new, the undertaking hazardous; the roads crossed large and rapid streams, and the legislature, in its wisdom, thought proper to create two separate and distinct bridge incorporations, with larger powers than were conferred on the turnpike corporations.

The preamble to the thirty-second section declares the motives and purposes of the legislature.   It was feared that the heavy freshets and dangerous obstructions to which the streams were subject, would endanger the permanency of the bridges, and require a frequent renewal of the whole capital; and that the corporations for erecting the bridges should be relieved from the policy of reversion, which attached to the corporations for constructing the turnpike roads, and that full powers, adequate to the execution of the work in the best manner, should be assured to those citizens who would successfully accomplish the building of the bridges.   It is impossible to read this recital, and escape the conclusion that the legislature thought the enterprise did not promise present remuneration, and that large powers and exclusive privileges must be given to get the stock taken and the bridges built.   It is evident that what was then considered a great scheme of internal improvement, was in the minds of the legislature.   Such a scheme was at that early period in the history of the state, not of easy solution.   It required more energy and foresight, and involved greater hazard, in the commencement of the century, to build turnpike roads through an unbroken wilderness, and erect bridges over dangerous streams, than it would *now* to checker the surface of a state with railways. These considerations are great helps in arriving at a correct knowledge of the intention of the legislature, and in giving a proper construction to the grants that were made.   For it should never be lost sight of, that the main canon of interpretation of a contract, is to ascertain what the parties themselves meant and understood.   In order to connect

the turnpike roads, it was necessary to cross the east and west branches of the Delaware, the Susquehanna and Chenango rivers. These streams were all in the same category. The work of improvement was incomplete until each was spanned with substantial bridges; and there is nothing to show that the dangers apprehended, and which formed the inducements to the grant of large powers, did not apply to all of them alike. Fifteen sections of the act are devoted to the creation of the Delaware Bridge Company, for the purpose of erecting bridges over the east and west branches of the Delaware river, with the usual faculties, powers and incidents of a corporation, and subject to the usual duties, regulations, restraints and penalties. The duration of the company was limited to thirty years, and competing bridges or ferries, within the prescribed limits of two miles above and below, were forbidden. These were important privileges, and justified by the peculiar circumstances of the country; and it is easy to see that without them, prudent men would not have engaged in the enterprise. The Delaware Bridge Company having been constituted with great minuteness of detail, a few words and a single section sufficed to bring into existence the Susquehanna Bridge Company. The thirty-eighth section of the act created the latter corporation, to erect and maintain toll bridges across the Susquehanna and Chenango rivers, at certain localities, and further declared that the "Susquehanna Bridge Company be, and hereby are, invested with all and singular the powers, rights, privileges, immunities and advantages, and shall be subject to all the duties, regulations, restraints and penalties, which are contained in the foregoing incorporation of the Delaware Bridge Company; and all and singular, the *provisions, sections* and *clauses* thereof not *inconsistent* with the particular provisions therein contained, shall be, and hereby are, fully extended to the president and directors of this corporation."

No one can read the entire act through and fail to per-

ceive that the legislature *intended* to create two bridge incorporations, exactly similar in all material respects. Protection was alike necessary to both; the public wants required both; the scheme of improvement embraced both; the danger of present loss applied to both; and there were the same motives to give valuable franchises to both.

The inquiry then is, has the legislature used language that clearly conveys that intention? and on this point we entertain no doubt. It is not questioned that the provision limiting the Delaware charter to thirty years, was carried into the Susquehanna charter, but it is denied that the prohibition against competition was also imported.

The clause in the Delaware charter on that subject is in the following words: "That it shall not be lawful for any person or persons, to erect any bridge, or establish any ferry across the said west and east branches of the Delaware river, within two miles, either above or below the bridges to be erected and maintained in pursuance of this act." This was, undoubtedly, a covenant with the Delaware company that they should be free from competition within the prescribed limits. It is argued because the east and west branches of the Delaware are named, that the prohibition was not intended to reach the Susquehanna company. But this construction is narrow and technical, and would defeat the very end the legislature had in view. It is true, there were certain minor provisions in the Delaware charter, which were peculiar to it, and of course it would be absurd to suppose that they were transferred, or intended to be transferred, to the Susquehanna company, but by the terms of the law, whatever provisions were applicable, were extended to the latter company. It is easy to see that the legislature never meant that the judges of Delaware county, who were to visit and inspect the Delaware bridges, should also visit and inspect the Susquehanna, because there were similar officers in Tioga county, where the Susquehanna bridges were located. But the

privilege against competition was *applicable* to both corpo-
rations, and in the unsettled state of the country, necessary
to the existence of both, for the legislature well knew that
it would be madness for adventurers to build toll bridges
in a new country, where travel was limited and settlers
few, if the right was retained to authorise other adven-
turers to build other bridges so near as to divide even that
limited travel. The form adopted in making the grants has
weight in arriving at the true legislative intention, and it
is worthy of consideration that it is not unusual in the
legislation of this country to grant vast powers in a short
act, by referring to and adopting the provisions of other
corporations of like purposes. In fact, some of the great
enterprises of the day have sprung into existence and dis-
tributed their blessings by virtue of legislation similar to
that which created the Susquehanna Bridge Company.
The object is apparent, not to encumber the statute book
by useless repetition and unnecessary verbiage. The legis-
lature of New York, at great length, and with commendable
care and circumspection, incorporated the Delaware com-
pany, and then to avoid repetition, gave to the Susquehanna
company all the rights and advantages, which in the same
act were conferred on the Delaware corporation. *This was
enough*, but in fear of cavil, and to avoid any misconstruc-
tion, and out of superabundant caution, it was declared
that all the provisions, sections and clauses in the Delaware
charter, not *inconsistent* with the particular provisions of
the Susquehanna charter, should be fully extended to the
president and directors of the latter corporation. There
were no inconsistencies between the two corporations,
except such as would arise from difference in *locality*, and
in every other respect the corporations were alike. Each
was to bridge two streams, and each needed and did receive
the fostering care of the legislature. When it is conceded,
as it must be, that a franchise which prohibits competition
is an advantage, and that it was enjoyed by the Delaware

company, and that there is nothing in the peculiar provisions of the Susquehanna charter which prevents that company from enjoying it, then it is conferred, and there is an end to controversy.

The history of the subsequent legislation of the state on the subject of these bridges, is explanatory of the intention of the legislature of 1805, and confirmatory of the view already taken. In 1808, the Susquehanna and Chenango bridges were not built, and longer time and greater privileges were required to insure the success of that enterprise. The legislature, in fear that the scheme of internal improvement, which was not complete without the bridges, would fail, furnished still greater inducements to the parties proposing to erect them. The thirty years limitation was repealed and the charter made perpetual, and the time limited for building the bridges was extended four years. And these provisions of the Susquehanna charter which were thus altered, and treated by the legislature of 1808 as belonging to it, were, if part of it, imported from the Delaware charter. Can it be supposed for one moment that when the Susquehanna company was demanding higher privileges in order to *live*, that it was the intention of the legislature to deprive it of the right to shut out competition with which the Delaware company was invested, and which was nearly as valuable as the right to take tolls.

The intention of the legislature was manifest to confer on the Susquehanna corporation all the advantages enjoyed by the Delaware company that were applicable to it and consistent with the different locality it occupied, and the language used, in our opinion, gives effect to that intention, and the two mile restriction is as much a part of the charter of the Susquehanna company as if it had been directly inserted in it. It is argued that the restriction cannot apply to the Chenango bridge, because it is located less than two miles from the confluence of the Chenango river with the Susquehanna. But the restriction is for two miles

either above or below the bridges, and it is applicable to a bridge built above, and within the prohibitory limits, although a question might arise whether it was extended to a bridge which was built below the junction of the streams. The Susquehanna company, by the original charter, were to erect bridges over both the Susquehanna and Chenango rivers, but with the amendments which were made in 1808, it was declared to exist for the sole purpose of building and maintaining a bridge over the Susquehanna, while at the same time the privilege of bridging the Chenango was given to " The Chenango Bridge Company," a new corporation, created with the same faculties and franchises, and subject to the same duties and restrictions as the Susquehanna corporation. The construction which has been given to the Susquehanna charter is, necessarily, a solution of all questions, pertaining to the charter of the Chenango Bridge Company. The legislature, therefore, contracted with this company if they would build and maintain a safe and suitable bridge across the Chenango river at Chenango Point, for the accommodation of the public, they should have in consideration for it a perpetual charter, the right to take certain specified tolls, and that it should not be lawful for any person or persons to erect any bridge or establish any ferry, within a distance of two miles on the Chenango river either above or below their bridge. Has the legislature of 1855 broken the contract which the legislatures of 1805 and 1808 made with the plaintiffs ?

The foregoing discussion affords an easy answer to this question. The legislature has the power to license ferries and bridges, and so to regulate them, that no rival ferries or bridges can be established within certain fixed distances. No individual without a license can build a bridge or establish a ferry for general travel, for " it is a well settled principle of common law, that no man may set up a ferry for all passengers, without prescription time out of mind,

or a charter from the king. He may make a ferry for his own use or the use of his family, but not for the common use of all the king's subjects passing that way, because it doth in consequence tend to a common charge, and is become a thing of public interest and use, and every ferry ought to be under a public regulation." (*Harg. L. T. chap. ii*, 16; 17 *Conn.* 63; 20 *John.* 100; 2 *McLean*, 383.)

As there was no necessity of laying a restraint on unauthorized persons, it is clear that such a restraint was not within the meaning of the legislature. The restraint was on the legislature itself. The plain reading of the provision, " that it shall not be lawful for any person or persons to erect a bridge within a distance of two miles," *is*, that the legislature *will not make it lawful* by licensing any person or association of persons to do it. And the obligation includes a free bridge as well as a toll bridge, for the security would be worthless to the corporation if the right by implication was reserved, to authorize the erection of a bridge which should be free to the public. The Binghamton Bridge Company was chartered to construct a bridge for general road travel, like the Chenango bridge, and near to it, and within the prohibited distance. This was a plain violation of the contract which the legislature made with the Chenango Bridge Company, and as such a contract is within the protection of the constitution of the United States, it follows that the charter of the Binghamton Bridge Company is null and void.

The decree of the court of appeals of New York is reversed, and a mandate is ordered to issue, with directions to enter a judgment for the plaintiffs in error, the Chenango Bridge Company, in conformity with this opinion. Mr. Justice NELSON did not sit in the argument of this cause, on account of sickness.

Mr. Justice GRIER dissenting. I feel constrained to dissent from the opinion of the majority of my brethren, which has just been read. The general principles of law, as con-

nected with the question involved in the case, are, no doubt, correctly stated, as to the strict construction of statutes as against corporations claiming rights so injurious to the public. But my objection is, that they have not been properly applied to the case before us.

The power of one legislature to bind themselves and their posterity, and all future legislatures, from authorising a bridge absolutely required for public use, might well be denied by the courts of New York; and as a construction of their own constitution, we would have no right to sit in error upon their judgment. But assuming such a power, for one legislature to restrain the power of future legislatures, those who assert that it has been exercised, must prove their assertion beyond a doubt. Such intention must be clearly expressed in the letter of the statute, and not left to be discovered by astute construction and logical inferences. Although an act of incorporation may be called a contract, the rules of construction applied to it are admitted to be the reverse of those applied to other contracts. Yet the opinion of the court, while admitting the rule of construction, proceeds on a contrary hypothesis, and with great ingenuity and astute reasoning, has given a construction most favorable to the monopolist and injurious to the people.

To regard the general language of this act of incorporation as first bringing from the *east* and *west* branches of the Delaware to the Susquehanna company, a provision as to what it should not be lawful for any person or persons to do, and then as bringing it from the Susquehanna company, and incorporating in the charter of the Chenango Bridge Company a clause that "it shall not be lawful for any person or persons, to erect any bridge or establish any ferry across the '*west*' and '*east*' branches of the Delaware river, within two miles, either above or *below* the bridge," and make it read so as to apply to the Chenango river, with a single stream two miles above, and one-fourth of a mile (its entire

extent) below, and then apply to the Susquehanna for one mile and three-fourths further down, and, at the same time, get rid of the thirty years' limitation in the Delaware charter, is, I think, going an unusual and irrational stretch beyond all ordinary rules of construction in such cases.

It seems to me that the fact that it required so ingenious and labored an argument by my learned brother to vindicate such a construction of the act in question, is itself conclusive evidence that such construction should not be given to it.

Mr. Chief Justice CHASE and Mr. Justice FIELD, concur.