Chenango Bridge Company *v.* Lewis.

———————— • • • ————————

THE CHENANGO BRIDGE COMPANY *vs.* FREDERICK LEWIS and others, executors &c. of Hazard Lewis, deceased.

The plaintiffs were incorporated in 1808, by a perpetual charter allowing them to erect a toll-bridge across the Chenango river, for the accommodation of the public; and it was declared to be unlawful for any person to erect a bridge, or establish a ferry, within two miles of the plaintiffs' bridge. Under this charter, the plaintiffs erected their bridge, and had ever since maintained it. By an act of the legislature, passed in 1855, the Binghamton Bridge Company was incorporated, for the purpose of constructing a toll-bridge across the same river, *within two miles of the plaintiffs' bridge,* and a bridge was built by them, about 80 rods above the plaintiffs' bridge, under the direction of L., (the defendants' testator,) as contractor, who was a stockholder of the Binghamton Bridge Company, and owned the land at one end of said bridge. It was completed prior to August 5, 1856, and was opened as a toll-bridge, and used as such until it was carried away. L. repaired the bridge, prior to its destruction, under contracts with the company, of which he was a director at the time of his death, in 1863. On the 17th of March, 1865, the Binghamton bridge was swept away by a freshet, and was carried against the plaintiffs' bridge and destroyed it. In an action brought by the plaintiffs against the B. Bridge Company, to restrain the building of the bridge, and for damages, the Supreme Court of the United States decided that such bridge was both contrary to law, and an infringement of the plaintiffs' legal rights.

*Held,* 1. That the bridge was a private nuisance.

2. That the defendants, as personal representatives of L., who had erected and continued such nuisance, were liable to the plaintiffs for the damages caused by the Binghamton bridge : including the diversion of tolls, and the value of the bridge destroyed.

Chenango Bridge Company *v.* Lewis.

The liability for a nuisance is not restricted to persons who occasion the whole of it; but those who are guilty of doing but a part are liable, also, if they do it with like intent.

Thus, where the nuisance is not the structure, but the illegal *use* of it, the liability attaches not only to those who are engaged in the use, but also to those who erected the structure with the knowledge, or the intent, that it should be put to the illegal use. And the liability of the builder is precisely the same as if he had been the employer, instead of the employee.

It is the general rule that the creator of a nuisance is liable for its continuance. To this rule there is an exception, where he is not in possession of the premises, which are occupied by other persons claiming them as their own, and not holding as his tenants.

The books of a corporation, proved to have been kept by its treasurer, in the business of the company, and to be in his handwriting, accompanied by proof of his death, are admissible in evidence, under the rule that entries made in the usual course of business, by one who had no interest to falsify, should be received in evidence, after his death.

The books of a bridge company proved by its treasurer to have been kept by him, and to contain correct entries of tolls, as given to him by the toll-gatherer, coupled with proof by the toll-gatherer that he had made correct reports of the toll received by him, are admissible as evidence, because proved by the treasurer who kept them.

But books of the company, proved by its treasurer to have been received by him as the company's books, upon his accession to office, and containing an account of the tolls received for a period of several years previous to that time, are not admissible as evidence to prove the amount of tolls received during that period, without the necessary and proper preliminary proof as to such tolls.

It is not sufficient to show that such books are *said to be,* or that they *purport* to be, the books of the corporation. To make their contents evidence, it is not enough, to prove that they appear to be the books of the corporation; nor is it enough, to prove that they were in the handwriting of the former treasurer, or toll-gatherer.

MOTION for a new trial, upon exceptions, ordered to be heard at general term, after verdict for the plaintiff. The case was this. The plaintiffs were incorporated in 1808. (*Laws of* 1805, *ch.* 89; *Laws of* 1808, *ch.* 119.) By their charter they were to erect a toll-bridge across the Chenango river, for the accommodation of the public. And it was declared to be unlawful for any person to erect a bridge or establish a ferry within two miles of the plaintiffs' bridge. The charter was perpetual. Under

Chenango Bridge Company *v.* Lewis.

this charter the plaintiffs erected their bridge, and have ever since maintained it, except on occasions when new bridges were being erected in place of the old ones.

By chapter 164, of the laws of 1855, the Binghamton Bridge Company was incorporated, for the purpose of the construction of a toll-bridge across the Chenango river, within two miles of the plaintiffs' bridge. Its capital stock was 400 shares. Of these, the defendants' testator subscribed for, and became the owner of, 60 shares. At that time he was the owner of certain premises upon the bank of the river, about 80 rods above the plaintiffs' bridge; and Daniel S. Dickinson owned a corresponding portion of the opposite bank. These premises were conveyed by them to the Binghamton Bridge Company. And upon them a toll-bridge was erected across the river by the defendants' testator, under contract with the Binghamton Bridge Company. That bridge was completed prior to August 5, 1856, and was opened as a toll-bridge, and used as such, until it was carried away by a freshet, March 17, 1865. Between those dates, the defendants' testator repaired the Binghamton bridge, under contract with the company; and he was a director of the company until his death, in 1863. March 17, 1865, the Binghamton bridge was carried away by a freshet, and was carried against the plaintiffs' bridge, and destroyed it. May 17, 1856, the plaintiffs brought their action against the Binghamton Bridge Company to restrain the building of its bridge, and for damages. That case finally went to the Supreme Court of the United States, (*see* 3 *Wall.* 70,) and such proceedings were therein had, that, December 1, 1866, judgment of this court was entered in favor of the plaintiffs, and against the Binghamton Bridge Company, for $4595.61. Upon which execution was issued and returned wholly unsatisfied.

The plaintiffs then brought this action to recover damages for the diversion of tolls, and for the loss of their

bridge. The jury have rendered a verdict for the plaintiffs for $7718.88, and the defendants now move for a new trial, upon exceptions.

*L. Seymour,* for the defendants.

*Henry R. Mygatt,* for the plaintiffs.

P. POTTER, J. The plaintiffs seek to maintain this action upon this theory : That the Binghamton bridge was a *nuisance ;* that the defendants' testator erected and continued that nuisance; that by a familiar rule, all who are engaged in the commission of a nuisance, trespass, or other illegal act, are principals; and liable to respond in satisfaction for the *whole.* The defendants, in reply, contend that the bridge was not a nuisance. In this, I think, the defendants are mistaken. The United States court has decided that it was both contrary to law, and an infringement upon the plaintiffs' legal rights. It was also to the plaintiffs' hurt. Therefore it was clearly what is known in law as a private nuisance. The defendants further contend, that the bridge, itself, was not a nuisance, but only became so, by its use; that Mr. Dickinson and the defendants' testator, or their grantees, had a right to bridge the stream for their private convenience ; that the erection of the bridge was therefore innocent and lawful; and, that the defendants' testator cannot be held responsible for the erection of a nuisance; because the nuisance was not created by the erection of the bridge, but by its subsequent unlawful use. The defendants are doubtless correct in their simple position, that riparian owners have a right to bridge a stream for their private use ; but, the *conclusion,* I am inclined to think, does not follow ; because the liability for a nuisance is not *restricted* to persons who occasion the whole of it, but those who are guilty of doing but a *part,* are liable also, if they do it with the like

intent.    That is to say, in this very case, when the nuisance is not the structure, but the illegal *use* of it, the liability attaches not only to those who are engaged in the use, but also to those who erected the structure with the knowledge, or the intent, that it should be put to the illegal use.    (*Fish* v. *Dodge*, 4 *Denio*, 311.    *Pickard* v. *Collins*, 23 *Barb.* 444.    *Gilhooley* v. *Washington*, 4 *N. Y.* 217.)    It can hardly be contended, upon the facts in this case, that the defendants' testator did not know of the *use* for which the bridge was intended.    And his liability is precisely the same as if he had been the employer, instead of the employee.    (1.*Chitty's Plead.* 83, 84..    *Thompson* v. *Gibson,* 7 *Mees. & W.* 456.)    As to his liability for the *continuance* of the nuisance, it is in proof in the case, that he was engaged in keeping the bridge in repair.    Besides, it is the general rule, to which there is but one exception, stated in *Blunt* v. *Aikin,* (15 *Wend.* 522,) that the creator of a nuisance is liable for its continuance ; and it has been specially held that one who erects a nuisance upon the land of a stranger is liable for its continuance, though he cannot enter there to remove it.    (*Thompson* v. *Gibson,* 7 *Mees. & W.* 456.    *Fish* v. *Dodge,* 4 *Denio,* 317.)

I am therefore of the opinion that the defendants are liable, in this action, for the damages caused to the plaintiffs by the Binghamton bridge.

The defendants objected, on the trial, to the admissibility of the plaintiffs' books, and those of the Binghamton Bridge Company ; and they now contend that their reception was error.    This evidence was of three kinds. 1. The books of the Binghamton Bridge Company, proved to have been kept by its treasurer in the business of the company ; and to be in his handwriting, and that the treasurer was dead.    2. The books of the plaintiffs, proved by its treasurer to have been kept by him, and to contain correct entries of tolls, as given to him by the toll-gatherer, and coupled with proof, by the toll-gatherer, that he had

made correct reports of the tolls received by him. 3. The books of the plaintiff, proved by its treasurer to have been received by him as the company's books, upon his accession to the office. These are all objected to as hearsay, and not relating to transactions between the parties.

1. The first were plainly admissible, under the rule that entries made in the usual course of business, by one who had no interest to falsify, should be received in evidence after his death. (*Price* v. *Earl of Torrington*, 1 *Salk.* 285, *and cases cited in note. Union Bank* v. *Knapp*, 3 *Pick.* 106. 1 *Stark. Ev.*, *5th Am. ed.*, 298 *to* 302. *Cowen & Hill's Notes*, *pp.* 675, 676, *note* 489. *Nicholas* v. *Webb*, 8 *Wheat.* 326. *Halliday* v. *Martinet*, 20 *John.* 168. *Halliday* v. *Littlepage*, 2 *Munf.* 316. *Nichols* v. *Goldsmith*, 7 *Wend.* 160. *Briggs* v. *Low*, 5 *Gill & John.* 134. *Farmers and Mechanics' Bank* v. *Boraef*, 1 *Rawle*, 152. *Welsh* v. *Barrett*, 15 *Mass.* 386. *Leland* v. *Cameron*, 31 *N. Y.* 115, 121.)

2. The second set of books were admissible, because proved by the treasurer who kept them. (*Union Bank* v. *Knapp*, 3 *Pick.* 106. *Cooper* v. *Marsden*, 1 *Esp.* 1.) The evidence of these books before the jury was clear upon the point of damages to the plaintiffs, by the diversion of tolls, and to prove the extent of such diversion, the receipts of toll in former years was legitimate evidence, *tending* to prove the extent of damages; but,

3. *The plaintiffs'* books offered to prove this amount of tolls which was received prior to the year 1860, I think, were erroneously admitted, for the want of the necessary and proper preliminary proof as to such tolls. It was not sufficient to show that they *are said to be*, or that they *purport* to be, the books of the corporation. To make their contents evidence, it is not enough to prove that they appear to be the books of the corporation; nor is it enough to prove that they were in the handwriting of the former treasurer or toll-gatherer. (*Highland Turnpike Co.*

v. *McKean*, 10 *John*. 154.) The plaintiffs' own books, or rather an abstract from them, was offered, to show the amount of toll received from 1848 to 1855, and to 1860, for a period of more than ten years before the witness had any personal knowledge of the correctness of the entries therein. The objection was plainly made, and overruled, and the evidence admitted. This, I think, was error. It is impossible to say that such proof did not influence the jury; it was evidence upon a material point; evidence made by the plaintiff; and used in his favor. I think it was hearsay, as to entries before 1860. As the question will probably arise upon another trial, I think it proper to say that the ruling upon the trial on the question of the statute of limitations, was correct, upon the authority of *Scovil* v. *Scovil*, (45 *Barb*. 517.) We need not discuss the other objections; they seem to have no merit. The result is, there should be a new trial, for the error stated; costs to abide the event.

MILLER, P. J., concurred.

PARKER, J. The court held the defendants liable to the plaintiffs for the loss of their bridge, by the floating of the Binghamton bridge against it, and carrying it away, without reference to the question whether said latter bridge was negligently or unskillfully built, or not.

I am inclined to think this was wrong. The building of the Binghamton bridge was not unlawful. The Binghamton Bridge Company had the right to build upon its own premises whatever it chose—bridge or whatever else— so long as the mere building did not interfere with the rights of others. (30 *N. Y.* 44, 62.)

It is necessary to distinguish between the *use* of the bridge, which was what caused the loss of tolls to the plaintiffs, and the simple building of it. It is the former which made the bridge a private nuisance as to the plain-

tiffs, and not the latter. It was only in respect to its *use* as a public bridge that the plaintiffs had any right to complain. Only in that single view, and to that extent, alone, was it a *nuisance;* and in abating the nuisance, the plaintiffs would have had no right to go further than was necessary to prevent such *use,* (36 *N. Y.* 300; 3 *Hill,* 621 *to* 624,) as the court would go no further in enjoining the Binghamton Bridge Company, (46 *Barb.* 666,) and as the plaintiffs, in their first suit against the Binghamton Bridge Company, sought no further relief. (30 *How. Pr.* 348.) In *Barclay* v. *Commonwealth,* (25 *Penn.* 503,) Woodward, J, says: " When an erection or structure constitutes the nuisance, as when it is put in a public street, its destruction, or removal, is necessary to the abatement of the nuisance; but when the offense consists in a wrongful use of a building, harmless in itself, the remedy is, to stop such use, not to tear down or remove the building itself." This clearly indicates the distinction between the erection, and the use, of the bridge, which it is necessary to keep in mind in this case. If it were the structure itself, which constituted the nuisance, the erection of it would be wrongful; but not so when the nuisance consists only in the use of the structure, in itself harmless. The erection of such a structure is not wrongful; whatever may be the motive with which it is erected. (23 *Barb.* 459. 5 *Seld.* 450. 13 *Wend.* 261.) In respect to the bridge in question, however long it might have stood, before being opened to the public use, the plaintiff would not have been harmed by it. It is not possible, then, to make the act of erecting it wrongful. The wrong begins only from the forbidden use of it.

The building of the bridge, then, not being unlawful, nor wrongful against the plaintiffs, there is no ground for holding H. Lewis, or his estate, liable for the going off of the bridge, and its floating against the plaintiffs' bridge and carrying it off; unless it went off by reason of negli-

gence or unskillfullness in its construction. And the court was in error in holding the contrary, and in excluding all consideration of that question from the case.

As to the liability for the opening of the bridge to public use, although there may be much room to doubt whether H. Lewis could be made liable, individually, for what he did as a corporator, (*see* 1 *East*, 555,) yet it may be that enough appears in the case to implicate him, individually, in that act, and so to make him liable to the plaintiffs for the loss of tolls occasioned by the wrong.

In respect to the admissibility of the books of the plaintiffs' treasurer in evidence, I agree with my brother POTTER, that they were not admissible, any further than their contents were verified by the treasurer. They were admitted to show the yearly tolls of the plaintiffs' bridge, for eight years next prior to 1855, and the eight years next succeeding, although the treasurer who introduced them became treasurer in 1860, and then first became acquainted with them. I do not see on what principle the plaintiffs were entitled to use their own books for the thirteen years before 1860, entirely unauthenticated as they were, against the defendants, who were utter strangers, and in no way connected with them; to make out, by the comparison of yearly amounts of toll, received by the plaintiffs before and after the Binghamton Bridge Company's bridge was opened for travel, the loss occasioned by such opening. If such comparison was a competent mode of showing the loss for which the defendants were accountable, (which may be doubted,) still the evidence of the yearly receipts (prior to 1860) was, I think, most clearly defective, in the absence of proof of the correctness of the entries in the books, relied upon. These entries, as they stood upon the books, when offered and admitted in evidence, were merely the plaintiffs' declarations; and these declarations were taken, against the defendants' objection, as evidence. It seems to me palpably wrong.

For the two reasons above assigned, I am of the opinion that a new trial should be granted, with costs to abide the event.

New trial granted.

[THIRD DEPARTMENT, GENERAL TERM, at Elmira, May 7, 1872. *Miller, P. Potter* and *Parker,* Justices.]