THE CHENANGO BRIDGE Co., Respondent, *v.* CLINTON I. PAIGE et al., Executors, etc., Appellants.

The bed and banks of a fresh water river, where the tide does not ebb and flow, are the property of the riparian proprietors, the public having an easement only for passage as on a public highway ; and such proprietors may use the land or water of the river in any way not inconsistent with this easement.

The legislature, except under the power of eminent domain, can interfere with such a river only for the purpose of regulating, preserving and protecting the public easement.

Any person owning land on both sides of the river may without legislative authority, and even in defiance of legislative prohibition, maintain a ferry or bridge for his own use, providing he does not interfere with the public easement.

Such owner, however, cannot, without legislative authority, maintain a bridge or ferry for public use.

A wrong motive in erecting a structure otherwise lawful does not make the structure itself unlawful or a nuisance ; an unlawful use thereof may be complained of and restrained, but the structure cannot be destroyed.

Plaintiff was incorporated to build a bridge over the C., a fresh water river; by its charter (chap. 119, Laws of 1808) the building of any other bridge by others within two miles of the bridge to be erected by it was prohibited. Plaintiff's exclusive right, however, could only be exercised while its bridge was passable. Plaintiff erected such bridge and maintained it. Thereafter the B. B. Co. was incorporated, and by the act of incorporation (chap. 164, Laws of 1855) was authorized to build a bridge within two miles, and did build one within 100 rods of plaintiff's bridge, and maintained it as a toll bridge for public travel. L., defendant's testator, was one of the principal promoters of the B. B. Co., its president and largest shareholder; he built the bridge by contract with the company, and aided in maintaining it and keeping it in repair up to his death. Plaintiff, claiming that its charter constituted a contract, and that so far as the charter of the B. B. Co. authorized it to maintain a bridge for public travel, it was a violation of that contract, and so void, commenced suit against that corporation in 1856, to restrain it from constructing, using or allowing its bridge to be used for public travel, etc. Plaintiff was defeated in the courts of this State (27 N. Y. 87), but on appeal to the U. S. Supreme Court the judgment was reversed (3 Wall. 51), that court holding as claimed by plaintiff. In 1865, two years after the death of L., the bridge of the B. B. Co. was swept away by an unprecedented flood, it was carried down against plaintiff's bridge, and swept that away. This action was brought to recover damages for the destruction of plaintiff's bridge, and for the loss of tolls. *Held*, that plaintiff was not en-

titled to recover for the loss of its bridge; that the B. B. Co. had the right to erect its bridge, and could maintain it for public travel whenever plaintiff's bridge was impassable; the structure itself was, therefore, neither unlawful nor a nuisance when maintained with proper care, even if built designedly as a toll-bridge for public travel, but *held* that L. was liable for the wrongful diversion of tolls from plaintiff's bridge; that as the charter of the B. B. Co. so far as it authorized it to maintain its bridge for public travel was unconstitutional and void, it afforded no protection to those acting under it.

Also, that the provision of the Revised Statutes (2 R. S. 602, § 66) providing that where a construction has been put upon a statute by the Supreme Court every act done in good faith in conformity to that construction after such decision, and before reversal, shall be so far valid as to excuse from liability for a penalty or forfeiture, did not apply, as the action was not to enforce a penalty or forfeiture.

Also *held*, that even if the charter of the B. B. Co. was wholly void, so that those who built the bridge had no corporate protection, then the bridge would be considered as built by individuals having the rights of riparian proprietors, and as they could lawfully build it for their own use, it was not a nuisance or unlawful.

*C. B. Co.* v. *Paige et al.* (8 Hun, 292), reversed.

(Argued December 2, 1880; decided December 14, 1880.)

APPEAL from judgment of the General Term of the Supreme Court, in the third judicial department, in favor of plaintiff, entered upon an order made September 20, 1876, denying a motion for a new trial, and directing judgment on a verdict. (Reported below, 8 Hun, 292.)

The nature of the action and the material facts appear in the opinion.

*E. Countryman* and *Stephen C. Millard* for appellants. The court erred in refusing to hold that the construction of the bridge and the conduct of the Binghamton Bridge Company, having been sustained by the courts, defendants' testator was protected thereby, although such decision has since been reversed. (2 R. S. [1st ed.] 602, § 66; 3 id. [3d ed.] 703; 1 Kent's Com. 476; *Brown* v. *Crowl*, 5 Wend. 298; *Langley* v. *Warner*, 3 Comst. 327; *Simpson* v. *Hornbeck*, 3 Lans. 54; *Davis* v. *Marshall*, 14 Barb. 96; *Harris* v. *Jex*, 55 N. Y. 421;

66 Barb. 232.) The company having become the owner of land on both sides of the river owned the bed of the stream, and had, even without the special consent of its sovereign, the right to build a bridge on its own land, spanning the stream, and owed no duty to the public except to refrain from interfering with the navigation of the river. (*Ex parte Jennings*, 6 Cow. 527, 543; *The People* v. *Gutchess*, 48 Barb. 656; *The People* v. *Platt*, 16 Johns. 195; *Ft. Plain Bridge Co.* v. *Smith*, 30 N. Y. 44; 16 Ohio [Griswold], 540; 2 Wis. 308; 4 id. 497; 30 How. Pr. 357, 358; Angell on Highways, §§ 54, 56, 65, 66; Thompson on Provisional Remedies, 248, 240; *Yates* v. *Milwaukie*, 10 Wall. 497; 2 Pars. on Cont. 523; *Hepbern's Case*, 3 Bland's [Md.] Ch. 98.) As a mechanical structure the bridge and its builders were free from all blame. (*Barclay* v. *The Commonwealth*, 25 Pa.; *Moody* v. *B'd of Sup'vrs of N. Co.*, 46 Barb. 660, 666; *Auburn & Cato Plk. Road Co.* v. *Douglass*, 5 Seld. 446; *Ely* v. *Sup'vrs of N. Co.*, 36 N. Y. 300; 63 Barb. 117; 27 N. Y. 87.) The Binghamton bridge was not a common, public or private nuisance. (4 Black. Comm. 166; Shearm. & Redf. on Negligence, 394; *Myers* v. *Malcolm*, 6 Hill, 292; 2 Black. 218; *Ft. Plain Bridge Co.* v. *Smith*, 30 N. Y. 62; *Lansing* v. *Smith*, 8 Cow. 153; 3 Black. 214; Hilliard on Torts, 632; 18 Barb. 222; 13 J. & S., 646; *Harris* v. *Thompson*, 9 Barb. 364; *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 220, 259; *Mohawk Bridge Co.* v. *U. & S. R. R. Co.*, 6 Pa. 565, note *a*.)

*O. W. Chapman* for respondent. The charter of the Binghamton Bridge Company was null and void. (*Chenango Bridge Co.* v. *Binghamton Bridge Co.*, 3 Wall. 71; *S. C.*, 30 How. 358.) The charter, being null and void, could give to Lewis no protection against plaintiff's claim for actual damages caused by his acts under such pretended charter. (Wood on Nuisances, 788, § 750.) When Lewis built the Binghamton bridge within two miles of plaintiff's bridge, he was engaged in an unlawful act (3 Wall. 71; 30 How. 346, 358), and the bridge so built being an invasion of plaintiff's legal rights, was a nuisance to

plaintiff. (Wood on Nuisances, 897, § 867.) The building of the bridge being an unlawful act and a nuisance, Lewis was responsible to plaintiff for any injury plaintiff might suffer by reason of such building, irrespective of any negligence in construction or maintenance. (*Losee* v. *Saratoga Paper Co.*, 42 How. 392; *Irvine* v. *Wood*, 51 N. Y. 224, 487; *Hay* v. *Cohoes Co.*, 2 id. 159; *Congreve* v. *Smith*, 18 id. 79, 84; *Hudson R. R. Co.* v. *Loeb*, 7 Robt. 424; Wood on Nuisances, 111, § 108.) The act under which the Binghamton bridge was built and maintained shows that it was built simply and solely as and for a toll bridge, which was unlawful. (*Meeker* v. *Van Rensselaer*, 5 Wend. 397; *Aiken* v. *Benedict*, 39 Barb. 400; *Fry* v. *Prentice*, 14 L. T. [N. S.] 298; 3 Hill, 621–624; affirmed, 7 id. 575; 23 Barb. 459; 5 Seld. 450; 13 Wend. 261; 63 Barb. 115; *Chipman* v. *Palmer*, 77 N. Y. 56; Wood on Nuisances, 144, § 144.) In any event plaintiff was entitled to recover for the tolls of which it was deprived by reason of Lewis' erection and maintenance of this bridge. (Wood on Nuisances, pp. 82, 88, § 77; p. 881, § 842; p. 885, § 850; *Thompson* v. *Gibson*, 7 Mees. & Wels. 456; 2 Hilliard on Torts, 417 [3d. ed.]; *Vandenburg* v. *Truax*, 4 Den. 464; *Chipman* v. *Palmer*, 77 N. Y. 56.) The judge was right in declining to hold that inasmuch as the courts of this State had sustained the charter of the Binghamton Bridge Company, Hazard Lewis was protected, even though the Supreme Court of the United States had reversed these decisions of our courts. (8 Hun, 292, 295, 296; 3 Wall. 71; 30 How. Pr. 346, 358; Wood on Nuisances, 788, § 750.) The judge was right in refusing to hold "that this is not a cause of action which survives against the representatives of the wrong-doer." (63 Barb. 111; 8 Hun, 292; 2 R. S. 447, m. p., § 1; *Elder* v. *Bogardus, Ex.*, Hill & Den. 116; 2 R. S. 447, § 1, m. p.) The judge was right in declining to hold that the building of the bridge was not in itself an unlawful act or nuisance, and it was only the use of the bridge that was unlawful and a nuisance. (3 Wall. 71; 30 How. Pr. 346, 358; 63 Barb. 111.) The judge was right in declining to rule and decide that de-

fendant's bridge " was a lawful structure, and that, therefore, the plaintiff cannot recover upon that part of the claim." (3 Wall. 71; 30 How. Pr. 346, 358; 63 Barb. 111, pt. 3.) The judge was right in declining to charge the jury that plaintiff could not recover for the diversion of tolls beyond a period of six years previous to bringing suit, and that plaintiff is limited to the tolls diverted during such six years. (2 R. S. 448, § 8; 63 Barb. 111; *Scovil* v. *Scovil*, 45 Barb. 517.) The judge was right in declining to charge that the use to which the Binghamton bridge " was put does not affect the defendant's liability for the taking away of the plaintiff's bridge." (Angell on Water-courses, § 402; *Fish* v. *Dodge*, 4 Den. 311.) An action for the erection of a nuisance does not outlaw, for it is continuous, and is as if it were a new erection daily. (*Rosewell* v. *Prior*, Salk. 459; 12 Mod. 639; *Thompson* v. *Gibson*, 7 Mees. & Wels. 456; *Fish* v. *Dodge*, 4 Den. 311; *Conhocton Stone Road* v. *Buff., N. Y. & E. R. Co.*, 51 N. Y. 573, 581, 582; *Clancy* v. *Byrm*, 56 id. 134, 135; *Rosewell* v. *Prior*, 12 Mod. 639.) Executors can be sued for the tort of their testator causing injury to property. (2 R. S. 447, §§ 1, 2; *Elder* v. *Bogardus, Ex., etc.*, Hill & Den. 116; *Mahon, Ex.*, v. *N. Y. C. R. R. Co.*, 24 N. Y. 458; *Scott* v. *Shepherd*, 2 W. Bl. 892; *McAfee* v. *Croford*, 13 How. [U. S.] 447; *Vandenburg* v. *Truax*, 4 Den. 464.)

EARL, J. The plaintiff was incorporated by the act chapter 119 of the Laws of 1808, to build and maintain a bridge over the Chenango river, and by its charter it was provided that it should not be lawful for any person or persons to erect any other bridge over the same river within two miles either above or below the bridge to be erected by the plaintiff. Soon after its incorporation, the plaintiff erected a bridge over the river at Binghamton and maintained it until it was swept away, as hereinafter mentioned.

In 1855, by the act chapter 164 of that year, the Binghamton Bridge Company was incorporated to build a bridge over the same river. It was authorized to build its bridge within

two miles of plaintiff's bridge, at a point not less than eighty rods above it, and to take tolls for the use of the same, and it was empowered to purchase, take and hold real estate for the purpose of its bridge. In 1855 and 1856, it built its bridge less than one hundred rods above plaintiff's bridge and maintained it as a toll bridge for public travel until it was swept away, as hereinafter mentioned.

Hazard Lewis, defendants' testator, was one of the principal promoters of the Binghamton Bridge Company, and one of its largest stockholders. He was a director of the company from its organization and its president from 1858 to the time of his death, on the 2d day of July, 1863. He built the bridge by contract with the company, and aided in maintaining it and keeping it in repair to the time of his death.

The plaintiff, claiming that its charter constituted a contract that the legislature would not license or authorize the construction of any other bridge over the river within two miles of its bridge, and that the charter of the Binghamton Bridge Company, so far as it authorized that company to maintain a bridge for public travel, was a violation of that contract and therefore null and void, in 1856 commenced an action against that company, praying in its complaint for judgment that the defendant therein be perpetually enjoined from constructing, using or allowing its bridge to be used for public travel, and from receiving any tolls or compensation for crossing its bridge, and that it be required to remove or shut up the same, so that it could not be used to the injury of the plaintiff, and also praying for damages. That action was brought to trial and the plaintiff was defeated. It then appealed to the General Term of the Supreme Court, and then to the Court of Appeals, and the judgment against it was affirmed, those courts holding that there was not such a contract as plaintiff claimed, and that the charter of the Binghamton Bridge Company gave it valid authority to build and maintain its bridge for public travel. (27 N. Y. 87.) The plaintiff then appealed to the Supreme Court of the United States, where the judgment of the State courts was, in December, 1865, reversed. (3 Wall. 51.) That

court held that plaintiff's charter constituted an inviolable contract that the legislature would not authorize or license the erection of another bridge within the limited distance, and that, so far as the charter of the Binghamton Bridge Company authorized it to maintain its bridge for public travel, it was null and void.

In March, 1865, nearly two years after the death of Lewis, there was an unprecedented flood in the Chenango river, and it swept away the bridge of the Binghamton Bridge Company, and that was carried down the stream against plaintiff's bridge and swept that away. Four years afterward, in 1869, this action was commenced against the executors of Lewis to recover damages for the destruction of plaintiff's bridge and for loss of tolls. The theory upon which the plaintiff sought to maintain the action was that the upper bridge was an unlawful structure — a nuisance — and that as Lewis built it and aided during his life-time in maintaining it, his estate could be made liable for the damage caused thereby to the plaintiff. The action was brought to trial, and plaintiff recovered for the loss of the bridge and the loss of some tolls. Its judgment was, upon appeal to the General Term, reversed upon a question of evidence. (63 Barb. 111.) A new trial was then had. There was no claim upon the trial that the upper bridge was carelessly or improperly built or maintained. The undisputed proof showed that that bridge was swept away by a flood in the river greater and more violent than had ever been known there before. The trial judge sustained the theory upon which the plaintiff commenced its action, and holding that there was no dispute in the evidence as to the amount of plaintiff's damages, directed a verdict in its favor for $8,200 for damages to its bridge and $785.94 for damages by reason of the diversion of tolls from its bridge. The defendants then appealed to the General Term of the Supreme Court, where the judgment was affirmed (8 Hun, 292), and then they brought this appeal to this court.

The main question to be determined by us is whether the plaintiff was entitled to recover the large sum awarded to it for

the destruction of its bridge. We are of opinion that it was not.

The Chenango river is a fresh water stream. It is the private property of the riparian owners. The public, in such streams, have an easement only for navigation and for floating logs and timber. As well said in *Ex parte Jennings* (6 Cow. 518): "The public right is one of passage, and nothing more, as in a common highway. It is called by the cases an easement; and the proprietor has a right to use the land and water of the river in any way not inconsistent with this easement. If he make any erection rendering the passage of boats, etc., inconvenient or unsafe, he is guilty of a nuisance; and this is the only restriction which the law imposes upon him." And when the case between these two bridge companies was first before this court (26 How. Pr. 124), Judge SMITH, in an opinion written by him, said: "The Chenango river is a fresh water stream, in which the tide does not ebb and flow, and is, therefore, a private river. The riparian proprietors own the bed and banks. As early as 1798 it was declared a public highway, but subject to the public easement for the purpose of navigation. The riparian owners might make such use of it as they pleased; might bridge and dam it, except as prohibited by acts of the legislature, and might cross it with ferries, except as so forbidden."

The legislature, except under the power of eminent domain, upon making compensation, can interfere with such streams only for the purpose of regulating, preserving and protecting the public easement. Further than that, it has no more power over these fresh water streams than over other private property. It may make laws for regulating booms, dams, ferries and bridges, only so far as is necessary to protect and preserve the public easement; and when it goes further, it invades private rights protected under the Constitution. (*Canal Com'rs v. The People*, 5 Wend. 423, 448; *Penn v. Wheeling & Belmont Bridge Co.*, 18 How. [U. S.] 421, 432; *Morgan v. King*, 35 N. Y. 454.)

Any person owning the land upon both sides of such a river

can maintain a ferry or bridge or dam for his own use, provided he does it so as not to interfere with the public easement, without any authority from the legislature, and even in defiance of a legislative prohibition. In such case he would but be making a proper use of his own property. Such use must, however, be such as not to interfere with the rights of other riparian owners. And there is one more limitation: He cannot, without legislative authority, maintain a bridge or ferry for public and general use, because public highways and toll bridges and toll ferries are subject to legislative regulation and control. As said by Judge DAVIS in 3 Wall.: "The legislature has the power to license ferries and bridges, and so to regulate them, that no rival ferries or bridges can be established within certain fixed distances. No individual without a license can build a bridge or establish a ferry for general travel, for ' it is a well-settled principle of common law that no man may set up a ferry for all passengers, without prescription time out of mind, or charter from the king. He may make a ferry for his own use, or the use of his family, but not for the common use of all the king's subjects passing that way, because it doth in consequence tend to a common charge, and is become a thing of public interest and use'; and every ferry ought to be under a public regulation.' "

Now what rights did the legislature give the plaintiff by its act of incorporation? It made it a corporation, and gave it the corporate right to build its bridge. For that purpose only a corporation was not needed, nor was legislative sanction needed. But being authorized by the legislature to build the bridge, it could not be complained of for any necessary interference with the public easement which was under legislative control; for that which is authorized by law cannot be a public nuisance. (*Crittenden* v. *Wilson*, 5 Cow. 165; *The People ex rel. Murphy* v. *Kelly*, 76 N. Y. 475, 482.) It was also authorized to maintain the bridge for public travel, and to take tolls for the use of the bridge; and these it could not do without legislative authority. The legislature did not empower it to interfere with the stream, except so far as was

necessary for the building and maintenance of its bridge, and gave it no authority, and could give it no authority, except under the power of eminent domain upon compensation, to interfere in any way with riparian rights of owners above or below its bridge.

What rights were conferred upon the Binghamton Bridge Company by the act of 1855, incorporating it? That act unquestionably made it a corporation, and it had all the rights and powers conferred upon it by the act against the whole world except the plaintiff. No one but the plaintiff could assail any of its corporate rights, so long as its bridge was properly and safely maintained, so as not unnecessarily to interfere with the public easement. The plaintiff's bridge might have been swept away, or might have been abandoned by it, or it could, for a consideration, have surrendered its exclusive right to the Binghamton Bridge Company; and in such case that company could have exercised all its corporate franchises in a proper manner, without question from any source. The plaintiff's charter gave it the exclusive right between the limits specified, only while its bridge was passable. The Binghamton Bridge Company could, therefore, under its charter maintain its bridge for public travel, without violating plaintiff's rights, while its bridge was not in condition to be used for public travel. How far, then, did the act of 1855 violate the contract made with the plaintiff in its act of incorporation? Not by authorizing the construction of the bridge. That, as a structure, did no harm to the plaintiff. As a bridge it invaded none of its rights. As to it the bridge was neither unlawful nor a nuisance; and the plaintiff could not complain of its existence so long as it was maintained with proper care and skill. There was a lawful purpose for which the legislature as against the plaintiff could have authorized its construction, to wit: to be used for public travel while its bridge was not passable.

But suppose we are wrong in holding that the charter of the Binghamton Bridge Company was not wholly null and void; and suppose that it was wholly invalid, so that those who built the bridge had no corporate protection whatever; what

then follows? Then the corporation must be regarded as non-existent, and the bridge was built by those concerned in the supposed corporation as individuals having the rights of riparian owners. They could build the bridge for their private use as riparian owners, or they could build it for no use and permit it to stand as a monument of their folly ; and so long as it did not interfere with the public easement or with riparian rights, it would neither be a nuisance nor unlawful.

It is said, however, that there was no proof that the Binghamton Bridge Company owned the lands. on both sides of the river where it built its bridge. There was proof that it owned the land upon one side, and as its bridge had been maintained for ten years, it must be presumed that it owned the land upon the other side or occupied it by the license of the owner. But even if it did not own the land upon either side, and hence had trespassed upon the lands of others, the plaintiff cannot complain of, and has no concern with, such trespasses.

But it is strenuously contended by the learned counsel for the plaintiff that, as the upper bridge was built designedly as a toll bridge for public travel, it thereby became unlawful and a nuisance. His argument on this branch of his case was quite ingenious, but, we cannot doubt, was unsound. His contention is, that the unlawful use cannot be separated from the structure, and that the structure was a nuisance and could have been abated as such, because it was built and used for an unlawful purpose. This contention finds no warrant in the decision of the Federal court reported in 3 Wallace. It was not there decided that the bridge itself was a nuisance or unlawful, and no such question was before that court. The improper use of the bridge, which was claimed to be justified under the charter of the Binghamton Bridge Company, was the matter there in controversy. A wrong or unlawful motive in erecting a building otherwise lawful does not make the building itself unlawful or a nuisance. In such case the unlawful use may be complained of, restrained or abated, but the building cannot be destroyed. Take two cases somewhat analogous to this: Suppose one erects upon his own land a house intended to be

used as a bawdy house, and while it is being so used it is
blown down without any fault of the owner, and injures the
adjoining property of another who had the right to complain
of the use of the house as a nuisance; could the party thus
injured sue the owner of the house for the injury to his prop-
erty? Or suppose one erects upon his own land a steam boiler
manufactory, and carries on therein the business of manufac-
turing boilers in such a way as by the noise to make his busi-
ness an actionable nuisance to one living upon the adjoining
lot; and suppose the building is blown down without his fault,
and injures the neighboring property; can the owner thereof
recover for the injury thus done him? It is plain that these
questions must be answered in the negative. In both of the
cases supposed, the buildings are lawful structures, and it is the
use only which could be complained of, and the use has noth-
ing whatever to do with the injury. So here the bridge was a
lawful structure, and it was its use only which was unlawful,
and such use had nothing whatever to do with the destruction
of plaintiff's bridge. To further illustrate these views a few
cases may be referred to. In *Barclay* v. *The Commonwealth*
(25 Penn. 503), WOODWARD, J., said: "Where an erection or
structure itself constitutes the nuisance, as where it is put up
in a public street, its demolition or removal is necessary to the
abatement of the nuisance; but where the offense consists in a
wrongful use of a building, harmless in itself, the remedy is
to stop such use, not to tear down or remove the building it-
self." In *Moody* v. *Supervisors of Niagara Co.* (46 Barb.
659), it was held, that the fact that a house is kept as a place
of prostitution is sufficient to render it a public and common
nuisance; that a house cannot be lawfully destroyed by a riot
or mob, merely because, for the time being, it is devoted to a
purpose which the law characterizes as a common nuisance,
and that for the purpose of abating a nuisance, so much only
of the thing as causes the nuisance should be removed; and
that where it is the wrongful use of the building that consti-
tutes a nuisance, the remedy is to stop such use, not to tear
down or demolish the building itself. To the same effect are

*Ely* v. *Supervisors of Niagara Co.* (36 N. Y. 297), and *Bab-cock* v. *City of Buffalo* (1 Sheldon, 317, affirmed in 56 N. Y. 268). In *Phelps* v. *Nowlen* (72 N. Y. 39), it was held, that a party is not liable for the consequences of an act done upon his own land, lawful in itself, and which does not infringe upon any lawful rights of another, simply because he was influenced in the doing of it by wrong and even malicious motives.

We conclude, therefore, that there was error in awarding to the plaintiff damages for the destruction of its bridge.

But the damages for the wrongful diversion of tolls from plaintiff's bridge stand upon a different footing. It was wrongful to maintain and use the upper bridge for public travel as a toll bridge. In using or allowing the bridge to be used for that purpose, the owner thereof infringed upon the rights of the plaintiff secured to it under its charter, and did it an actionable injury, and the damages for such injury must be measured by the amount of tolls diverted. As a wrong was thus done to the plaintiff, we can see no reason for not applying the general rule, that all persons who are engaged in a wrongful or unlawful act are liable for the consequences thereof, whether they act as principals or as agents. The testator, Lewis, was active in building and maintaining the bridge for the purpose of the use to which it was subjected. He was a director from the organization of the Binghamton Bridge Company, and its president at the time the tolls were taken for which he has been held, and he was a large stockholder in that company. He was actively engaged in resisting the suit brought by this plaintiff against that company, and was fully notified of plaintiff's claim that that company had no right to allow public travel or take toll upon that bridge. In these acts, there was enough *prima facie* at least to make him liable as a wrong-doer within the rule above stated, unless he was shielded by considerations now to be noticed. It is claimed that he could not be a wrong-doer for acting under an act of the legislature. But that act was unconstitutional, so far as it authorized the maintenance of that bridge for public travel. An unconstitutional

act is as if it had never been passed by the legislature. It can confer no rights and afford no protection. As said by Judge Cooley, in his work on Constitutional Limitations, at page 188: "When a statute is judged to be unconstitutional, it is as if it had never been. Rights connot be built up under it; contracts which depend upon it for their consideration are void; it constitutes a protection to no one who has acted under it, and no one can be punished for having refused obedience to it before the decision was made. And what is true of an act void *in toto* is true also as to any part of an act which is found to be unconstitutional, and which, consequently, is to be regarded as having never, at any time, been possessed of any legal force." Therefore whether Lewis must be considered to have acted for himself as a stockholder, or as an agent of the stockholders or of the corporation, the statute furnished him no protection.

It is further said that as all the State courts had held that the bridge could be lawfully maintained under the act of the legislature, and as their decision was not reversed by the Federal court until after the tolls in question had been taken, such decision in some way furnished him protection; and our attention is called to section 66 of article 1, title 3, chapter 9, part 3 of the Revised Statutes (2 R. S. 602), which provides, that "whenever, by the decision of the Supreme Court, any construction has been or may be given to any penal or other statute, every act done in good faith, in conformity to such construction, after such decision was made, and before a reversal thereof by the court for the correction of error, shall be so far valid, that the party doing such act shall not be liable to any penalty or forfeiture for any such act that shall have been adjudged lawful by such decision of the Supreme Court." It is sufficient to say that this is not an action to enforce any penalty or forfeiture, and therefore not within that section. The legislature did not intend to relieve a party, under the circumstances mentioned, from the consequences of his acts violating private rights, and it would probably not have had the power to do so, even if it had so intended. When Lewis was con-

cerned in taking these tolls, he had notice of plaintiff's claims and acted at his peril.

The amount of tolls received by the Binghamton Bridge Company was sufficiently proved. The book kept by the treasurer of the company was produced, and that was the book in which such tolls were entered. The entries were made by the treasurer, who was dead at the time of the trial, and such entries were against his interest, as they charged him with the amount of such tolls. They were, therefore, admissible for the purpose of showing the amount of tolls received by that company. (1 Greenl. Ev., § 120.)

The amount of tolls thus received was *prima facie* evidence of the amount of tolls diverted from the plaintiff, as that bridge was within one hundred rods of plaintiff's bridge, and there was no other bridge over the same stream below plaintiff's bridge, or above it within five or six miles.

It follows from these views, that plaintiff's judgment should be reversed and a new trial granted, costs to abide event; unless it will stipulate to reduce its judgment by striking therefrom the $8,200 and the interest thereon; and in case of such stipulation, the judgment for the balance should be affirmed, without costs to either party in this court.

All concur except MILLER, J., who did not sit.

Judgment accordingly.